READ DRUG & CHEMICAL COMPANY OF BALTI-
MORE CITY, A CORPORATION,

*vs.*

JENNIE NATTANS.

*Landlord and tenant*: *agreement to renew; mutuality; specific
performance. Statute of Frauds*: *part performance.*

An agreement between a landlord and tenant for the renewal
of a lease is not, in its nature, lacking in mutuality; and where
the landlord has fully complied with the conditions by him to
be performed, the specific performance or execution of the lease
by the lessee, according to its terms, may be decreed, if it be
sufficiently definite.                              pp. 70-71

An agreement to lease a designated piece of property for a
prescribed term at a designated rental, if it is properly exe-
cuted, is a complete contract, and the specific execution of the
lease may be decreed, even though it does not contain covenants
that leases of property usually contain.              p. 71

Although under the Statute of Frauds a contract might not
be enforceable, yet if one party has performed the obligations
which the contract imposed upon him, specific performance by
the other may be decreed.                            p. 72

*Decided May 17th, 1916.*

Appeal from the Circuit Court of Baltimore City. (DAW-KINS, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CON-STABLE, JJ.

*Randolph Barton, Jr.,* and *Joseph C. France* (with whom was *J. Pembroke Thom* on the brief), for the appellant.

*Lee S. Meyer* and *Charles F. Harley,* for the appellee.

URNER, J., delivered the opinion of the Court.

A demurrer was sustained to the bill for specific perform-ance in this case, and the plaintiff having declined to amend, the bill was dismissed. The case stated in the bill of com-plaint is substantially as follows:

The plaintiff corporation is the owner of a drug business in Baltimore which it conducts in a building, occupied by it as lessee, at the southeast corner of Howard and Lexington streets. The business was established many years ago by Arthur Nattans and was subsequently transferred by him to the corporation now in charge, whose organization he effected and the whole of whose stock he owned or controlled. Mr. Nattans was also the owner of the leasehold estate in the property in which the business was then and is now being conducted. Upon his death in 1905 the property passed under his will to his wife, Jennie Nattans, for life, with vested remainders in their children. The stock held by Mr. Nattans in the drug company was bequeathed to trustees to be held for the benefit of the testator's widow and his chil-dren, including those by a former marriage. The corporate

enterprise was thereafter managed by a board of directors composed of Mrs. Nattans, her sons, Ralph A. Nattans and Arthur Nattans, Jr., and Samuel L. Bachrach, a son-in-law of the testator. Mrs. Nattans became president of the company and Ralph A. Nattans its general manager. By a lease executed on January 21, 1908, the store property was demised by Mrs. Nattans to the company for the term of ten years, computed from July 1, 1907, and ending on June 30, 1917, at a yearly rent of $11,000. The lease was signed by Mrs. Nattans individually and also as president of the lessee corporation. In the summer of 1914 the property was seriously damaged by fire. At that time the company was also occupying, under lease, an adjacent building to the south known as the Hamman property. After the fire questions arose as to the cost of restoring the Nattans building, what part of the cost should be borne by the drug company as tenant, and what extension should be made of the existing lease. Upon the recommendation of Ralph A. Nattans, as general manager, it was decided by the company that it would expend about $30,000 in repairing and improving both of the leased buildings, so that they might be used advantageously as one store, provided the leases were renewed and the owners would turn over to the company such amounts as they received on account of the insurance on the buildings. A resolution was accordingly passed by the board of directors authorizing the general manager to make an agreement with Mrs. Nattans for the cancellation of the current lease and for the execution of a new lease for twelve and one-half years, beginning January 1, 1915, at a rental of $16,000 per annum for the first four years, $18,000 per annum for the second four years, and $20,000 per annum for the remainder of the term. In this action of the directors Mrs. Nattans participated as a member of the board. It is alleged that she had personally fixed and agreed upon the increased rentals and the extension of term mentioned in the resolution. A new lease for the Hamman property, creating a term which would expire at the same time as the proposed new

Nattans lease, was prepared and executed, Mrs. Nattans signing on behalf of the drug company as its president. The projected lease extending the term for the Nattans property, which was to have been signed by Mrs. Nattans individually as lessor, and in her capacity of president of the company as lessee, remained unexecuted. Nevertheless all the contemplated improvements were made with the company's funds, the payments being made, and the checks therefor being drawn, by Mrs. Nattans and her son Ralph, as president and general manager, respectively. These appropriations were made by the company in reliance upon the agreement of Mrs. Nattans to execute a new lease for her property in accordance with the terms adopted by the resolution of the board of directors. In the meantime a controversy arose between Mr. Bachrach and the other directors, who were Mrs. Nattans and her two sons, over the action of the latter in passing a resolution providing additional compensation and a life contract for Ralph A. Nattans, as general manager, and also for an increase of salary for his brother, Arthur Nattans, who was serving as assistant manager, and proceedings were instituted to prevent these plans from being carried into effect. Subsequently Ralph and Arthur Nattans withdrew from the company and started a rival business. This was followed by the resignation of Mrs. Nattans as a director and by her refusal to execute the extension lease in consideration of which the lessee improved her property. It is charged that this refusal is a fraud upon the lessee's rights. The bill prays that the defendant may be compelled to perform her agreement to execute an extension and modification of the existing lease in conformity with the terms of the resolution heretofore mentioned. There is also a prayer for general relief.

In support of her demurrer the defendant asserts that the bill is not sufficient to entitle the plaintiff to the relief sought because the agreement relied upon is not mutual, specific and certain, and in compliance with the *Statute of Frauds.* These objections, in our opinion, are not sustainable. The

case we have stated, as alleged by the bill and admitted by the demurrer, presents ample ground for redress in equity. If a Court of Chancery could not afford relief from such a manifest injustice as the bill describes, it would be seriously deficient in its remedial powers. When a lessee of property has expended large sums of money in improving it upon the faith of the owner's promise to extend the lease for a specified term and rental, and, after the property has been thus improved, the owner refuses to make the extension, we can have no doubt as to the existence of adequate equity jurisdiction to require the agreement to be specifically performed.

There is no want of mutuality in the contract averred in the bill of complaint. The terms of the extension lease are alleged to have been specified by the defendant and accepted by the plaintiff and they are equally bound by the agreement thus effected. While the resolution of the company directed its general manager to make the agreement with the defendant for the intended new lease, it is apparent from the averments of the bill that the adoption of the resolution was simply designed as a formal acceptance of the terms which the defendant had herself proposed.

The agreement is said to be incomplete and hence incapable of enforcement because it does not provide for various covenants which leases of city property usually contain. The bill alleges an agreement to lease a designated property, for a prescribed term and at a specified rental. These elements are sufficient to constitute a complete and operative lease. Other provisions may be desirable and useful, but they are not essential to the binding effect of the demise. In *Ward* v. *Newbold,* 115 Md. 689, a contract for the creation of a ground rent was held not susceptible of specific enforcement because it did not state the duration of the term. There was a similar defect in the agreement considered in *Myers* v. *Forbes,* 24 Md. 598. In *Howard* v. *Carpenter,* 11 Md. 278, and *Gelston* v. *Sigmund,* 27 Md. 334, the agreements were sufficiently definite as to the term, but failed to mention the amount of the rent. Here, however, the term, the rent and

the property are all indicated with certainty. There is nothing indefinite as to any of the necessary features of the contract, and the defendant should not be relieved of its performance merely because it does not contain other and unessential terms for which the parties might have been expected to make provision. This conclusion is in accord with the ruling in the recent case of *King* v. *Kaiser,* 126 Md. 219, where it was held that specific enforcement of an agreement for the renewal of a lease at an increased and stated rent and for a defined period could not be refused on the ground of uncertainty in the contract.

The objection that the agreement is unenforceable in view of the *Statute of Frauds* was not pressed in the argument. There can be no difficulty as to this point, since the bill alleges a full performance of the contract by the plaintiff under circumstances which would make it appear that a refusal to execute the lease involves the commission of a fraud. *Equitable Gas Light Co.* v. *Balto. Coal Tar Mfg. Co.,* 63 Md. 297. *Semmes* v. *Worthington,* 38 Md. 327; 2 *Alexander's British Statutes,* Coe's Edition, 696, note.

The allegations of the bill require an answer, and the case will accordingly be remanded for further proceedings.

*Decree reversed, with costs and cause remanded.*